IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KELLY RUCKER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-12-1135 |
| | § | |
| | § | |
| HARLEQUIN ENTERPRISES, LTD., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

In 2011, Harlequin Enterprises, LTD. published a romance novel, *The Proud Wife*. The protagonists are a green-eyed, red-haired beauty and a tall, dark, handsome, wealthy man. After overcoming a series of obstacles to love, the couple rediscovers their passionate romance. Kelly Rucker alleges that this Harlequin novel infringes a copyright she holds for a romance story that she titled *How to Love a Billionaire*. Her book also features a green-eyed, red-haired beauty and a tall, dark, and handsome wealthy man. The book also describes how the couple overcomes a series of obstacles to their love that the ends with the couple . . . the sentence need not be completed.

Rucker submitted the first chapter and plot synopsis of *How to Love a Billionaire* to a romance-novel competition. She alleges that Harlequin obtained access to her work through a Harlequin editor serving as a judge for the competition. Rucker alleges direct, contributory, and vicarious infringement, asserting that *The Proud Wife* contains "over forty (40) instances of direct copyright infringement of Plaintiff's protected creative expression." (Docket Entry No. 1, ¶ 12). The complaint provides no specific examples, but the defendant provided copies of the works at

issue, which this court has read and compared.[1]

Harlequin has moved to dismiss. (Docket Entry No. 7). Rucker responded, (Docket Entry No. 12), and Harlequin replied, (Docket Entry No. 14). Based on the pleadings, the parties' briefs, the exhibits, and the relevant law, this court grants Harlequin's motion to dismiss. Rucker's complaint is dismissed. Because amendment would be futile, dismissal is with prejudice. Final judgment is separately ordered.

The reasons for these rulings are set out below.

**I.     Background**

Rucker wrote the first chapter and a brief plot synopsis of *How to Love a Billionaire* in 2009. (Docket Entry No. 1, ¶ 7). It is still unfinished and published. Rucker submitted this work to several romance-novel writing contests in 2009, 2010, and 2011. One contest was the 2010 "Spring into Romance Contest" sponsored by the Romantic Writers of America ("RWA"). *How to Love a Billionaire* was selected as a finalist.

Harlequin is a leading publisher of romance novels. It has a working relationship with RWA. Harlequin representatives, authors, and editors routinely serve as judges for RWA contests. Rucker believes that a Harlequin editor served as a judge for the 2010 RWA contest to which she submitted her work. As a judge, the editor would have reviewed the works to select the finalists. Rucker points out that Harlequin representatives, and the author of *The Proud Wife*, live in London,

---

[1] Harlequin attached both works as exhibits to its motion to dismiss. (Docket Entry No. 7, Ex. A, *How to Love a Billionaire*; Ex. B, *The Proud Wife*). Works referenced in the pleading and critical to the claims are properly considered on a Rule 12(b)(6) motion without converting it to one for summary judgment. *Downstream Envtl., L.L.C. v. Gulf Coast Waste Disposal Auth.*, 2006 WL 1875959, at *4 (S.D. Tex. July 5, 2006); *Randolph v. Dimension Films* (*Randolph II*), 634 F. Supp. 2d 779, 787 (S.D. Tex. 2009) ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." (quoting *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000))).

England. Harlequin published *The Proud Wife* in April 2011, roughly a year after the 2010 Spring Into Romance contest. Rucker read *The Proud Wife* and found what she asserts are numerous infringing similarities with *How to Love a Billionaire*.

*How to Love a Billionaire* is a 20-page first chapter followed by a 5-page plot synopsis. The work is about Cameron, a fabulously wealthy and handsome hotel magnate, and Merrick, his extraordinarily beautiful wife. The couple is estranged because a pregnant Merrick, believing that Cameron was unfaithful, is so distraught that she fell down a flight of stairs — possibly in a purposeful attempt to harm herself or the baby — miscarried, and ran away. Her belief in his infidelity was based on false information maliciously fabricated by Gia Correlli, the woman Cameron's controlling Italian grandmother wanted him to marry, who tried to regain Cameron's affection by sowing discord in his marriage. Cameron and Merrick reunite to finalize their divorce. Their plans are interrupted when they are kidnaped and held hostage for ransom at a remote cabin. They manage to escape, but Cameron is seriously injured. As Merrick nurses him back to health, they realize that their love endures. They passionately reunite. At the end, they remain married and Merrick is pregnant once more.

*The Proud Wife* is a full-length novel. The book begins when Matteo, a Sicilian prince, summons his estranged English wife, Marina, to Italy to finalize their divorce. She had left him after she lost their baby, believing that his disappointment over the miscarriage had ruined the marriage. Matteo realizes that he still loves Marina and lures her to the lovely beach where they had honeymooned under the pretext that they need seclusion to finalize their divorce without paparazzi scrutiny. There is a passionate reunion. Marina returns to England without finalizing the divorce. Matteo follows Marina to proclaim his love and finds her preparing to return because she too realizes that they love one another. At the end, they are married and she is pregnant with his child.

Harlequin moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). (Docket Entry No. 7). Harlequin concedes, for the limited purpose of this motion, that Rucker wrote and has a valid copyright for *How to Love a Billionaire*. (Docket Entry No. 7, at 4 n.2). Harlequin argues that Rucker did not allege facts necessary to show copying or actionable similarity.

As support for her allegation that Harlequin viewed and/or copied *How to Love a Billionaire*, Rucker alleges as follows:

- Harlequin had an active working relationship with RWA;

- Harlequin authors and editors often serve as judges in RWA contests;

- Harlequin representatives had access to the works submitted to RWA competitions;

- Rucker submitted her work to multiple RWA contests in 2009, 2010, and 2011; and

- Rucker's and Harlequin's dealings with the RWA overlapped.

Rucker alleges that Harlequin representatives or authors gained access to her work through participating in RWA contests. In the motion to dismiss, Harlequin argues that Rucker failed to plead sufficient facts showing Harlequin's access to the copyrighted work. In particular, Rucker failed to allege that Harlequin was involved in judging the particular contest to which she submitted her work. Instead, she alleged a series of speculations based on her assertion that Harlequin representatives routinely serve as judges and therefore have access to the works submitted for these contests. As a result, Rucker alleged, Harlequin must have had the opportunity to view and/or copy her work. Harlequin argues that Rucker's "working relationship" theory is factually insufficient to give rise to an inference that Harlequin had access to Rucker's work.[2]

Harlequin also argues that Rucker failed to show the necessary similarity between the two

---

[2] This court does not resolve whether Harlequin accessed Rucker's work because, as explained below, there is no actionable similarity between the works and therefore no infringement.

4

works. First, the complaint provides no specifics. "[T]he Complaint does not even allege the plot lines or other basic elements of the stories in each of the works." (*Id.* at 7). Harlequin argues that the assertion of over 40 instances of similarity is conclusory and legally insufficient to state a claim for relief. Second, Harlequin argues that what Rucker submitted was an unprotectable idea and that the way the two works express ideas differs. A third and related point is the result of the side-by-side comparison. Harlequin argues that only a few elements of the two works are substantially similar, and those few elements are legally unprotectable generic concepts such as *scenes-a-faire*, nondistinct characters, and common tropes in the romance genre. Harlequin argues that Rucker's copyright claims fail as a matter of law.

The works, and the parties' arguments and responses, are analyzed below.

## II. The Legal Standards

### A. The Legal Standard for a Motion to Dismiss

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), the Supreme Court confirmed that Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). To withstand a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570; *see also Elsensohn v. St. Tammany Parish Sheriff's Office*, 530 F.3d 368, 372 (5th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). In *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), the Supreme Court elaborated on the pleading standards discussed in *Twombly*. The Court explained that "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 1949 (citing *Twombly*, 550 U.S. at 555). *Iqbal* explained that "[a]

claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

When a plaintiff's complaint fails to state a claim, the court should generally give the plaintiff at least one chance to amend under Rule 15(a) before dismissing the action with prejudice. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal."); *see also Richardson v. Keffer*, 471 F. App'x 304, 305 (5th Cir. 2012) ("Although Rule 15 requires leave to be freely given, 'leave to amend . . . is by no means automatic.'" (quoting *Rourke v. Thompson*, 11 F.3d 47, 51 (5th Cir. 1993))); *Mosley v. Bowie County*, 275 F. App'x 327, 328 (5th Cir. 2008) ("The record is devoid of reasons for the denial of leave to amend the complaint; accordingly, the denial of such leave constitutes and abuse of discretion."); *United States ex rel. Adrian v. Regents of the Univ. of Cal.*, 363 F.3d 398, 403 (5th Cir. 2004) ("Leave to amend should be freely given, and outright refusal to grant leave to amend without a justification . . . is considered an abuse of discretion." (citation omitted)). A plaintiff, however, should be denied leave to amend a complaint if the court determines that the "proposed amendment . . . clearly is frivolous" or "advanc[es] a claim or defense that is legally insufficient on its face." 6 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1487 (3d ed. 2010); *see also Rio Grande Royalty Co. v. Energy Transfer Partners*, 620 F.3d 465, 468 (5th Cir. 2010) ("The trial court acts within its discretion in denying leave to amend where the proposed amendment would be futile because it could not survive a motion to dismiss."); *Ayers v. Johnson*, 247 F. App'x 534, 535 (5th Cir. 2007)

("'[A] district court acts within its discretion when dismissing a motion to amend that is frivolous or futile.'" (quoting *Martin's Herend Imports, Inc. v. Diamond & Gem Trading U.S. of Am. Co.*, 195 F.3d 765, 771 (5th Cir. 1999))).

### B.     The Legal Standard for Copyright Infringement

To prove copyright infringement, a plaintiff must show ownership of a valid copyright and actionable copying. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *Galiano v. Harrah's Operating Co., Inc.*, 416 F.3d 411, 414 (5th Cir. 2005). "A plaintiff bringing a claim for copyright infringement must demonstrate '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1076 (9th Cir. 2006) (quoting *Feist*, 499 U.S. at 361). When, as here, there is no direct evidence of copying, the second element requires the plaintiff to prove that the defendants had access to the plaintiff's copyrighted work and that there is substantial similarity of protected elements between the two works. *E.g.*, *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1174 (9th Cir. 2003).

Complaints alleging copyright infringement can be decided as a matter of law. "To determine whether an instance of copying is legally actionable, a side by side comparison must be made between the original and the copy to determine whether a layman would view the two works as 'substantially similar.'" *Creations Unlimited, Inc. v. McCain*, 112 F.3d 814, 816 (5th Cir. 2004) (emphasis omitted). A determination that no substantial similarity exists as a matter of law is "appropriate if the court can conclude, after viewing the evidence and drawing inferences in a manner most favorable to the nonmoving party, that no reasonable juror could find substantial similarity of ideas and expression.'" *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 142 (5th Cir. 2004) (citing *Peel & Co. v. The Rug Mkt.*, 238 F.3d 391, 395 (5th Cir. 2001)); s*ee also Folio Impressions, Inc. v. Byer Cal.*, 937 F.2d 759, 766 (2d Cir. 1991) (upholding the district court's

conclusion that there was no substantial similarity as a matter of law); *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1247 (11th Cir. 1999) ("[N]on-infringement may be determined as a matter of law on a motion for summary judgment, either because the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar.").

When the original work and the allegedly infringing work are submitted with the pleadings and available to the court for side-by-side comparison, substantial similarity can be decided on a Rule 12(b)(6) motion to dismiss. *See Christianson v. West Pub. Co.*, 149 F.2d 202, 203 (9th Cir. 1945) ("There is ample authority for holding that when the copyrighted work and the alleged infringement are both before the court, capable of examination and comparison, non-infringement can be determined on a motion to dismiss."); *Tabachnik v. Dorsey*, 257 F. App'x 409, 410 (2d Cir. 2007) (upholding dismissal of the plaintiff's copyright infringement claim with prejudice based on comparison of the plaintiff's doctoral dissertation and excerpts from the defendant's work); *Taylor v. IBM*, 54 F. App'x 794, 2002 WL 31845220, at *1 (5th Cir. 2002) (upholding dismissal with prejudice of a copyright infringement claim under Rule 12(b)(6)); *Nelson v. PRN Prods., Inc.*, 873 F.2d 1141, 1143 (8th Cir. 1989) (upholding dismissal with prejudice of copyright infringement claim alleging actionable copying of the plaintiff's song lyrics by the artist Prince; noting that "[t]he District Court had before it . . . complete copies of both [the plaintiff's] song and Prince's and was therefore in proper position to apply the substantial similarity test"); *Rosenfeld v. Twentieth Century Fox Film*, 2009 WL 212958, at *3 (C.D. Cal. Jan. 28, 2009) (dismissing with prejudice under Rule 12(b)(6) after finding no substantial similarity (citing *Christianson*, 149 F.2d at 203)).

A court must compare the copyrighted work and the accused work to determine whether there is substantial similarity between the protectable elements in the works. This requires two

steps: first, determining whether there are articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events in the two works; and second, distinguishing between the protectable and unprotectable material. Copyright law does not protect an idea but only "the expression of an idea." *Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir. 1996). A party claiming infringement may place "'*no* reliance upon any similarity in expression resulting from' unprotectable elements." *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1446 (9th Cir. 1994) (quoting *Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 901 (9th Cir. 1987)).

## III. Analysis

For present purposes, Harlequin does not challenge Rucker's claim to a valid copyright in the *How to Love a Billionaire*. The issue is whether there is substantial similarity between the protectable elements of Rucker's work and Harlequin's novel.[3] Rucker provided a table itemizing over 40 purported similarities "between characters, plot, themes, details, scenes, events, and dialogue." (Docket Entry No. 12, at 15).[4] The court has compared the entirety of the two works submitted.

Similarity of expression is shown by comparing treatment, details, scenes, events and characterization, and their total "concept and feel." In *Williams*, 84 F.3d at 587–89, for example,

---

[3] There may be other pleading deficiencies, as Harlequin argues in its motion to dismiss. This court does not need to consider them. The record includes both Rucker's work and the allegedly infringing work. This court can decide on the merits whether Rucker can bring a viable copyright-infringement claim. *See, e.g.*, *Christianson v. West Pub. Co.*, 149 F.2d 202, 203 (9th Cir. 1945) ("There is ample authority for holding that when the copyrighted work and the alleged infringement are both before the court, capable of examination and comparison, non-infringement can be determined on a motion to dismiss."). Even if this court allowed Rucker to cure her pleading deficiencies, the court would ultimately perform the same end task: conduct a full, side-by side comparison of the two works.

[4] The chart is somewhat confusing in that it has two sets of items numbered "1–10" and then "11–42." The first set numbered "1–10" and the second set with the same numbers appear to be descriptions of the same elements.

9

the court affirmed the grant of summary judgment against the plaintiff, a children's author. The court emphasized that a side-by-side comparison of the works revealed that "the total concept and feel" differ[ed] substantially." *Id.* at 589. The defendants' work consisted of "high-tech horror stories with villainous characters and gruesome bloodshed"; the plaintiff's work involved "adventure stories [that], although suspenseful in places, have happy endings." *Id.*; *see also Hogan v. DC Comics*, 48 F. Supp. 2d 298, 311 (S.D.N.Y. 1999) (explaining that the differences in the plaintiffs' and defendants' expression of similar ideas, "including the differences in [the works'] total look and feel, the interactions of the characters and the plot," were "so pronounced" as to preclude finding of substantial similarity).

Not all similarities are infringing; there are limits on what is legally protected. The expression of ideas is protected, but not the ideas themselves. The more a work is general and lacking in detail, the more likely the remaining ideas are to be broad, common, and unprotectable. *Kern River Gas Transmission Co. v. Coastal Corp.*, 899 F.2d 1458, 1463 (5th Cir. 1990). A court's analysis concentrates on "the protectable elements in the works, determining whether there are articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events." *Randolph v. Dimension Films* (*Randolph I*), 630 F. Supp. 2d 741, 746 (S.D. Tex. 2009).

The differences between the works at issue in *Randolph I*, are illustrative. The plaintiff argued that the works each involved "a dream world, a dream journal, 'shape shifting' creatures, a bike, and attacking fish." *Id.* at 748. The defendant moved to dismiss based on the absence of similarities of protectable elements. The court granted the motion, finding that the plaintiff's work, a synopsis, was a "general concept of an imaginary world or realm, or of a character searching for a father," not protected by copyright. *Id.* The court analyzed the themes and mood of the works,

10

finding that while some common elements were present, their use was different. For example, the protagonists in both works kept personal journals, but they did so in different ways. In one work, the journal is a medium for an unconscious father to communicate with his daughter, who is in her late teens. In the other work, a young boy uses the journal to write down his dreams, which are then realized. *Id.* These and other expressions of ideas contributed to the distinctly different "feel" of each work. One involved a young adult's exploration of "'human psyche' and the power of the mind, conscious and otherwise"; the other dealt with a child's struggles to overcome bullies and loneliness. *Id.* at 747–48.

There are significant differences between the two works at issue here. The couples in the two works have a different dynamic and relationship. In Rucker's work, the wife distrusts her husband and doubts whether she fits into his opulent lifestyle. Believing that he is cheating on her with an old flame, the wife injures herself, killing their unborn baby, then encourages her husband to leave for a trip so she can run away. In the Harlequin romance, the couple experiences different problems. The wife believes her husband has grown distant because she miscarried and failed to produce an heir. The husband wanted to offer comfort but misread his wife's grief as a sign that she needed solitude to mourn. When the wife leaves, the husband at first experiences a reemergence of feelings that she had married him for his wealth and status, not love.

The temporary dissolution of the couples' relationships is different. The relationship in *How to Love a Billionaire* falters because of the wife's suspicions about her husband's involvement with an old flame. The old flame is directly involved in creating the suspicions. After leaving the marriage, the wife changes her life by finishing her education and teaching in an inner-city school. (*How to Love a Billionaire*, at 3). She changes her name — not back to her maiden name, but to a third name that she creates. (*Id.* at 1, 3, 10). The dynamic among the husband and wife, the Italian

11

grandmother, and the old flame heavily affects the course of the couple's relationship. By contrast, in *The Proud Wife*, there is no "other woman." The couple separates because of a failure to communicate their feelings to one another. Believing that her marriage has failed, the wife leaves Italy and returns home to the United Kingdom, where she returns to her life and her old job. (*The Proud Wife*, at 39).

The events that the couple experience in each work are very different. In *How to Love a Billionaire*, the couple is kidnaped at gunpoint and held for ransom. Their escape is daring and dangerous. The shared danger leads them to rediscover their passion for each other. The mystery surrounding the infidelity and the kidnaping in *How to Love a Billionaire* are major subplots. In *The Proud Wife*, there are no such subplots. The couple separates. The husband wants to rekindle the relationship. He devises a subterfuge to take the wife to the secluded spot where they had been happy as newlyweds.

In both works, love overcomes trials and tribulations. In both works, a beautiful wealthy couple endures a miscarriage, separates, reunites, rediscovers their love and attraction for each other, recommits, and at the end, is expecting another child. This recitation of the generalized and basic plot emphasizes the works' similarities. But comparing the works as instructed by *Kern River* leads to the conclusion that the expression of these ideas and the resulting "feel" of the two works are significantly different. As in *Randolph I*, the mode of expression is sufficiently different that there is no actionable similarity between the works.

There are similarities between *The Proud Wife* and *How to Love a Billionaire*, but not in legally protected elements. The similarities between the two works are in generic elements — features, plots, characters, and elements found in many romance novels. A theme or trope that has long existed is not "expression" that the Copyright Act protects. Rather, infringement requires

"copying of constituent elements of the work that are original." *Peel & Co.*, 238 F.3d at 398 (emphasis omitted) (quoting *Feist*, 499 U.S. at 361). "Material or themes commonly repeated in a certain genre are not protectable by copyright," nor are "so-called *scenes à faire.*" *Am. Direct Mktg., Inc. v. Azad Int'l, Inc.*, 783 F. Supp. 84, 95 (E.D.N.Y. 1992); s*ee also Brown v. Perdue*, 2005 WL 1863673, at *8 (S.D.N.Y. Aug. 4, 2005) (noting, in response to the plaintiff's argument that the novel, *The Da Vinci Code,* infringed on his books, which incorporated religious themes, that the ideas and themes "find their origin in historical facts, events and figures, as well as pre-existing works"); *Tisi v. Patrick*, 97 F. Supp. 2d 539, 543 (S.D.N.Y. 2000) (explaining that structural similarities between the parties' musical compositions "are not significant because they are uniformly shared with most modern popular rock music"); *Historical Truth Prods., Inc. v. Sony Pictures Entm't, Inc.*, 1995 WL 693189, at *8 (S.D.N.Y. Nov. 22, 1995) ("[C]onspiracies, characters with superhuman qualities, and advanced technology . . . are unoriginal and uncopyrightable stock elements of the action-adventure and science fiction film genres"); *Jones v. CBS, Inc.*, 733 F. Supp. 748, 754 (S.D.N.Y. 1990) ("basic plot ideas" are not protectable); *Russ Berrie & Co. v. Jerry Elsner Co., Inc.*, 482 F. Supp. 980, 986 (S.D.N.Y. 1980) (shared characteristics of both parties' Santa toys of a "traditional red suit and floppy cap, trimmed in white, black boots and white beard" and "nose like a cherry" are common to all Santas and not probative of copying).

*Scenes à faire* generally involve "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic, what flows naturally from these basic plot premises." *Atari, Inc. v. N. Am. Philips Consumer Electronics Corp.*, 672 F.2d 607, 616 (7th Cir. 1982) (quotation omitted), *superseded by statute on other grounds*; *see also Metcalf v. Bochco*, 294 F.3d 1072, 1074 (9th Cir. 2002). These elements are not protected because they are strongly affiliated or connected with a common theme and thus not creative. *See, e.g.*, *Schwartz v.*

*Universal Pictures Co.*, 85 F. Supp. 270, 275 (S.D. Cal. 1945). *Scenes à faire* provide features that are "freely available for authors and creators to use in their creative works." *Randolph v. Dimension Films* (*Randolph II*), 634 F. Supp. 2d 779, 789 (S.D. Tex. 2009).

The similarities that Rucker asserts are either stock elements of romance novels or plot elements that naturally flow from the broad themes that the two works share with other works in the same genre. The two works share common tropes that are typical of, and generic to, the romance-novel genre. A beautiful woman and a handsome, wealthy man fall in love, become estranged, find themselves alone together in close quarters, have a passionate reunion, rediscover their love and commitment, and begin a new life together. These are familiar plot elements in the romance genre. Many of the similarities accompanying these tropes in the works are *scenes à faire*. They describe similarly choreographed scenes of love, estrangement, rediscovered passion, and recommitted love. The details of these scenes are similar not because of infringement, but because they flow logically from the plot elements.

Rucker cites several similarities between the characters as evidence of infringement. A character is not copyrightable unless the average lay person would readily recognize that character. *See Universal City Studios, Inc. v. Kamar Indus., Inc.*, 1982 WL 1278, at *4 (S.D. Tex. Sept. 20, 1982); *CBS Operations Inc. v. Reel Funds Int'l Inc.*, 2007 WL 2325218, at *4 n.6 (N.D. Tex. Aug. 13, 2007) (giving examples of distinctive characters, including Sheriff Andy Taylor and Barney Fife from *The Andy Griffith* Show and Rocky from the *Rocky* movies); *see also Rice*, 330 F.3d at 1175. The similarities between the characters in Rucker's work and in the Harlequin work are not legally protectable. Both male protagonists are black-haired, blue-eyed, "tall, dark, and handsome" figures. They are wealthy and powerful. The men sweep the female protagonists off their feet, into a

luxurious life. The women are beautiful, with red hair and green eyes.[5] They are slender, curvaceous, and young. Their personalities are strong-willed and passionate. These descriptions suffice to make it clear that these are generic characters in romance novels.

Some aspects of the way Rucker describes events emphasize the similarities between *How to Marry a Billionaire* and *The Proud Wife*. For example, Rucker states that in both works, when the couples meet for the first time after their two-year separations, "the heroine has divorce papers concealed and presents them to the hero at a key moment." (Docket Entry No. 12, at 18). What Rucker has described is the reader's first introduction in *How to Love a Billionaire* to Merrick, who reunites with Cameron in the work's first and only chapter. Cameron is hosting a press conference to announce his latest hotel-development venture when Merrick surprises him by appearing in the crowd. (*How To Love a Billionaire*, at 6–11). The couple meets in the parking lot, where Merrick presents Cameron with divorce papers. (*Id.* at 14–15, 19–20). Although a scene in *The Proud Wife* also features divorce papers, that scene presents a distinctly different series of events. The story opens with a frustrated Pietro in Italy, accepting that he must finalize his divorce from Marina. (*The Proud Wife*, at 1–10). Marina, who is thousands of miles away in the United Kingdom, is shocked when a messenger serves her with divorce papers. (*Id.* at 10–14). Pietro then demands her presence in Sicily by flying her down, in one hour, on his private jet. (*Id.* at 15–19, 28).

Many of the details Rucker cites are generic to such romance-novel stock characters. The heroines are roughly the same age, around 26. Romance novels are full of heroines in this age

---

[5] The parties debate the extent to which the heroines' eyes "change color with their mood and emotions in critical scenes. (Merrick: 'emerald flames at him', 'eyes darkening')." (Docket Entry No. 12, at 16). Regardless of the degree of similarity of change, this is not truly a description of the characters. Their eyes do not literally change color depending on their moods. This is a literary device meant to express the well-known idea that one's eyes can express thoughts or emotions. The expression of that idea — a shift in eye color reflecting a change in mood — is generic and not protectable.

cohort. Marina and Merrick both wear raincoats in the opening scenes — because it is raining. The fact that both wear black patent leather shoes — hardly a distinctive or novel feature — does not add to the protected-similarities calculus. In an initial scene, both women have their red hair pulled up. The hero in both works later remembers red hair spread across his pillow. These are *scenes-à-faire* elements that accompany memories of earlier passion, recalled at a time when obstacles to love loom large.[6] The female protagonists are generic to romance novels.

The male protagonists are equally generic. The men in both novels are wealthy beyond measure and live a life that most only imagine. Each has a private jet at his disposal and employees at his beck and call. These are generic details that follow logically from the description of the character as rich and powerful. Indeed, it is difficult to think of a more common way to express that a character is extraordinarily wealthy and powerful than to provide him his own jet and loyal confidants who do his "dirty work" for him. Cameron and Pietro are both described as having the ability "to charm anyone." (Docket Entry No. 12, at 16). The concept of a romantic, darkly handsome male lead as charming is as generic as that of the red-haired, green-eyed, beautiful female lead being alluring.

In sum, Rucker's comparisons of scenes, events, and characters between her work and the Harlequin novel show that they are common in romance novels. *See, e.g.*, *Green v. Lindsey*, 885 F. Supp. 469, 485 (S.D.N.Y. 1992) (analyzing the use of stock romance tropes of two works and holding that even if similarities existed, they were generally *scenes à faire*). Sweeping a woman off

---

[6] Rucker also describes both heroines as not wearing their wedding rings initially. (*See How to Love a Billionaire*, at 18). Marina does in fact wear her ring. She has it on when she is reunited with Pietro. (*The Proud Wife*, at 27). She also discovers, much to her frustration and consternation, that she cannot remove it in order to return it to Pietro. (*Id.* at 116). Harlequin describes her inability to remove the ring as a metaphor for "how bound Marina is to Pietro, despite her efforts to deny him." (Docket Entry No. 14, at 7).

16

her feet into a wealthier lifestyle is a popular trope, as is the brooding matriarch who disapproves of her son's choice of wife. Characters in romance novels must typically "hide their physical reaction[s]" on seeing one another. (*See* Docket Entry No 12, at 17). The use of pregnancy in a romance novel is not a new literary device. *See Green*, 885 F. Supp. at 486 (finding that pregnancy is "a condition that seems inevitably concomitant to the romance in romance novels of this genre").

Rucker argues that the works share a "similar sequence[s] of events." Rucker relies on *Shaw v. Lindheim*, 919 F.2d 1353 (9th Cir. 1990), for the proposition that a similar sequence of events is sufficient to support a finding of substantial similarity. *Shaw*, a Ninth Circuit case reviewing a summary-judgment decision, relies on the "extrinsic" and "intrinsic" tests to find substantial similarity. *Shaw*, 919 F.2d at 1358. The "extrinsic" part of the test is an objective analysis of expression; the "intrinsic" part is subjective and is merely the visceral reaction of the lay observer. *Id.* The Fifth Circuit, however, relies on a side-by-side analysis of the works. *Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 576 (5th Cir. 2003). The question is whether the side-by-side comparison leads to the conclusion that a lay observer would find substantial, protectable similarity between the two works. *Gen. Universal Sys.*, 379 F.3d at 142; *Peel & Co.*, 238 F.3d at 395. The side-by-side comparison between *The Proud Wife* and *How to Love a Billionaire* does not lead to the conclusion that the two works are substantially similar in protectable elements. The sequences and events Rucker describes do not convey the "total concept and feel of the works." *Positive Black Talk Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 374 n.13 (5th Cir. 2004), *abrogated on other grounds by Reed Elsevier, Inc. v. Munchnick*, 130 S. Ct. 1237 (2010)) (citation and internal quotation marks omitted).

In sum, the record shows no actionable similarity between the two works. The motion to dismiss is granted. Because amendment would be futile, the dismissal is without leave to amend.

**IV.	Conclusion**

Harlequin's motion to dismiss is granted. Rucker's complaint is dismissed. The dismissal is with prejudice because amendment would be futile. Final judgment is separately entered.

SIGNED on February 26, 2013, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge